UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                                              Case No.:  2:06-cr-19-FtM-29SPC

JORGE ALBERTO DELACRUZ DIAZ
_____

# REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

       This matter comes before the Court on the Plaintiff Jorge Alberto Delacruz-Diaz's Motion to Suppress Evidence (Doc. # 23) filed on February 16, 2006.  The Honorable Sheri Polster Chappell, United States Magistrate Judge, held a hearing on March 1, 2006.  At that hearing, the issue of the Defendant's standing to bring the Motion was raised by the Government.  The Defendant was allowed the opportunity to amend his Motion and file a brief addressing the standing issue.  A new hearing date was set for March 13, 2006.

       On March 9, 2006, the Defendant filed a Supplemental Memorandum of Law as well as an Affidavit addressing the standing issue. The Government choose not to respond to the Supplemental Memorandum.  Instead, at the hearing held on March 13, 2006, the Government withdrew its standing objection to the Motion stating that based upon the Defendant's affidavit it had become apparent that he had standing to invoke his Fourth Amendment rights.  With the standing issue resolved in favor of the Defendant, the hearing proceeded as scheduled.

The Government called Sergeant Kevin Ferry as its only witness and submitted photographs (Gov't. Composite Exhibit 1A-W), showing the outside and interior of the residence. The Defendant did not call any witnesses.

## TESTIMONY AND EVIDENCE

Sergeant Kevin Ferry: (Tr. 5-50).

Sgt. Ferry has served with Lee County Sheriff's Office (LCSO) for the last eleven (11) years. (Tr. 5:14-19). He is currently assigned to the LCSO's Major/ Violent Crimes Unit. (Tr.5:17-23). Sgt. Ferry stated that he investigated mostly crimes against persons involving shootings, stabbings, aggravated assaults and homicides. (Tr. 6:1-3). He testified to the events that occurred on January 16 and 17, 2006.

On the night of January 16, 2006, Sgt. Ferry responded to a call regarding an aggravated battery in the parking lot of La Mexicana Restaurant. (Tr. 6:8-23). When he arrived, the victim had already been transported to the hospital for treatment of his stab wounds. (Tr. 7:22-25, 8:1). Sgt. Ferry spoke with deputies on the scene and with the driver of the vehicle the victim had been riding in. (Tr. 7:3-21). The victim was identified as Jorge Alberto Delacruz-Diaz, the Defendant in this case. The driver of the vehicle, a white Dodge Stratus, identified herself as Jessica Martinez a.k.a. Nidia Colomo-Martinez. (Tr. 9:1-4). Sgt. Ferry noticed blood and dirt smeared on the hood of the Dodge Stratus, blood on the passenger side front seat and interior door panel, as well as blood smears on the passenger part of the vehicle. (Tr. 8:2-12).

During her interview, Martinez stated that she and the Defendant had been driving down from Georgia and had just pulled off I-75 to look for a hotel. (Tr. 7:8-21). According to Sgt Ferry,

Martinez stated that she did not know how the Defendant had been injured. (Tr. 7:8-10). Sgt. Ferry testified that he did not believe Martinez story but instead suspected that she was not telling the whole truth. (Tr. 24:15-25, 25:1-6). Sgt. Ferry did not interview the Defendant on the evening of January 16, 2006, because he was unconscious and had been taken into surgery for his wounds. (Tr. 25:16-24). Martinez was taken to an area hotel and given a place to stay for the night at the expense of the LCSO. (Tr. 9:16-19).

The vehicle was photographed and impounded and the surveillance tapes of the parking lot at La Mexicana restaurant were pulled for review. (Tr. 8:13-24). The surveillance tapes did not show anyone approach the vehicle or stab the Defendant while he was in the parking lot. (Tr. 8:19-24).

The following day, Sgt. Ferry and a victim's advocate met with Martinez and re- interviewed her regarding the incident. (Tr. 9:20-23). She told the same story as the previous night, that she did not know how the Defendant was stabbed. (Tr. 10:1-8). Sgt. Ferry then proceeded to the hospital, accompanied by Martinez, to interview the Defendant. (Tr. 10:9-15).

The Defendant's story did not match Martinez's reporting of the event. (Tr. 10:18-21). The Defendant stated that he was at a friends house with Martinez. (Tr. 11:5-6). He heard a knock at the door and when he answered it a black male stabbed him after asking for his money. (Tr. 11:8-11). Because of a conflict between the stories of Martinez and the Defendant, Sgt. Ferry again spoke with Martinez and she reiterated the same story . (Tr. 10:19-23). Sgt. Ferry then again interviewed the Defendant in regard to the facts. After Sgt. Ferry told him that Martinez told another story, the Defendant said that he had been drinking at a friend's house and that he and Martinez, who was his girlfriend, got into a fight and that she stabbed him. (Tr. 11:12-21). The Defendant told Sgt. Ferry

that the friend's name was Jesus. (Tr.12:1-3). He then gave Sgt. Ferry directions to the residence, a description of the house, and a description of the vehicle that was parked in the driveway. (Tr. 12: 4-12).

Sgt. Ferry had a patrol unit take Martinez to headquarters. (Tr. 13:1-4). He then went out to the residence which was located on Luckett Road. (Tr. 13:4-6). The house and vehicle parked there matched the description given to him by the Defendant. (Tr. 13: 9-13). Sgt. Ferry approached the house and noticed blood on the front door, on the sidewalk leading to the front door, and on the lattice work near the front door. (Tr. 13:9-13). When he approached the front door he could hear the T.V. and notice that the lights were on inside the residence. (Tr. 13:18-22). He knocked on the door but no one answered. (Tr. 13:22-24). The door was locked. (Tr. 13:24). He then went around to the back of the residence where he noticed the screened lanai door was open. (Tr. 13:25, 14:1-3). He noted that the rear door to the residence was open several inches. (Tr. 14:4-5). From that vantage point, he could see that the water in the kitchen sink was running and the tile floor in the kitchen was covered in blood. (Tr. 14:4-10). Because of the amount of blood that he noted, he suspected that there may be another victim. (Tr. 14:11-19). He knocked and announced "Sheriffs Office." (Tr. 14:20-22). When no one answered, he entered the residence and began going through the house looking for anyone else who may be injured. (Tr. 14:21-24).

Sgt. Ferry testified that in addition to the blood on the kitchen floor, he observed broken plates and food thrown against the walls. (Tr. 15:2-12). The rooms appeared to be in disarray. He continued room by room through the residence. Sgt. Ferry could see an extreme amount of blood on the floor of the living room. (Tr. 15:13-19). Sgt. Ferry testified that blood continued through the room and covered the sofa. (Tr. 15:8-10). Sgt. Ferry testified that he limited his search to rooms,

closets, under the bed, or any place a victim might have hidden to escape the attack. (Tr. 16:1-8). He searched the two back bedrooms and found the third bedroom door locked. (Tr. 15:21-25). He forced the locked door open because of concern that a second victim could be hiding, injured or dead in the room. (Tr. 16:9-19). There was no one in the room.

Once inside the third bedroom, Sgt. Ferry observed several large black duffle bags lined up against the wall. (Tr. 16:20-25). He also found a refrigerator, a round table and more black duffle bags which could be seen from the open closet. (Tr. 16:21-25, 17:1-7). The top shelf of the closet held seven (7) or eight (8) clear plastic bags containing what he believed to be marijuana. (Tr. 17:5-7). The air in the room was very cold and there was a strong odor of marijuana present. (Tr. 17:8-12). Upon discovering the alleged marijuana in the third bedroom, Sgt. Ferry called for a narcotics and crime scene unit to come to the residence. (Tr. 17:13-21). He then exited the residence to prepare a search warrant. (Tr. 17:18-21). Sgt. Ferry testified that he was not looking for marijuana when he entered the residence nor did he expect to find any marijuana when he arrived at the residence. (Tr. 17:22-25, 18:1-9). His sole purpose for entering the residence and searching was to determine if a second victim might be injured or dead inside the house. (Tr. Tr. 18:2-9).

## DISCUSSION

The Fourth Amendment protects individuals from unreasonable search and seizure. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) *cert. denied,* 534 U.S. 830 (2001). "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." Illinois v. Rodriquez, 497 U.S 177, 181, 110 S. Ct. 2793, (1990).

However, a warrantless search is allowed, where both probable cause and exigent circumstances exist.  U.S. v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991).

The general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking the exemption from the requirement. U.S v. Santa, 236 F.3d 662, 669 (11th Cir. 2000) (citing U.S. v. Lynch, 934 F.2d 1226, 1232 (11th Cir. 1991)).  They are required to show the need for entering a residence without a warrant. U.S v. Santa, 236 F.3d 669. The exigency exception only applies when the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action. U.S. v. Burgos, 720 F.2d 1520, 1526 (11th Cir. 1983).  Recognized situations in which exigent circumstances exist include: "danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and hot pursuit of a fleeing suspect." Santa, 236 F.3d at 669 (citing U.S. v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983)).  The test of whether exigent circumstances exist is an objective one. Santa, 236 F.3d at 669. The proper inquiry is whether or not the facts would lead a reasonable experienced agent to believe that he needed to enter the house before a warrant could be secured. Id.

The Defendant argues that the search of the residence violated his Fourth Amendment protection.  He states that no exigent circumstances existed to allow the search because there was no imminent danger of harm to the general public or to Sgt. Ferry because over eighteen hours had elapsed since the actual stabbing had occurred.

In the instant case, exigent circumstance did exist to justify the search of the residence without a search warrant.  Sgt. Ferry believed that from the amount of blood on the floor inside the residence that another victim might be inside the house. (Tr. 14:21-24, 15:13-19).  He had specific knowledge

that another individual had been present in the residence at the time of the offense. (Tr. 11:12-21,12:1-3). Furthermore, contrary to the Defendant's argument, Sgt. Ferry did not learn of the presence of the other individual or even that there was a residence where the incident took place until the next day when he interviewed the Defendant in the hospital. (Tr.11:12-16).

After learning of a third persons possible involvement, and the location of the residence, Sgt. Ferry immediately proceeded to that location. (Tr. 13:3-11). Upon his arrival he noticed an "extreme amount of blood" (Tr. 14:7-9), the lights were on (Tr. 13:21-22), the water was running in the sink (Tr. 14:9), the television set was on, (Tr.13:13:21), and no one answered when he announced himself. (Tr. 14:8-10). All of these factors would lead an officer to reasonably assume that someone might still be in the residence and to further conclude that the individual was injured because he would not respond to the officer's call.

Exigent circumstances exist for a warrantless search when an officer believes that the public is endangered. Santa, 236 F.3d at 669. Here, it is clear that Sgt. Ferry could reasonably assume that someone else might be injured in the residence. Based upon the evidence presented and the testimony given at the hearing, the Court finds that Sgt. Ferry did not violate the Defendant's Fourth Amendment rights. Therefore, it is respectfully recommended that the Defendant's Motion to Suppress be denied.

Accordingly, it is now

**RECOMMENDED:**

The Court on the Plaintiff Jorge Alberto Delacruz-Diaz's Motion to Suppress Evidence (Doc. # 23) should be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this   21st   day of March, 2006.

*[signature]*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies:  All Parties of Record